No. 12-0677 - *In Re: Petition for Reinstatement of L. Dante DiTrapano*

WORKMAN, Justice, concurring, with Loughry, Justice, joining:


I concur with the majority's refusal to reinstate Mr. DiTrapano's law license at this time. Mr. DiTrapano has made great progress in remedying his very significant substance abuse issues, and from a rehabilitative perspective, he has developed an impressive record. Upon a thorough examination of the record before this Court, however, I am very concerned with the issue of honesty and integrity. The level of Mr. DiTrapano's blatant dishonesty directly impacting an attorney/client relationship[1] is profoundly disturbing, but I am even more concerned with whether he has truly accepted responsibility for that conduct. While Mr. DiTrapano asserts that he does accept full responsibility and that he is remorseful for such conduct, some of the statements in the proceedings below and in his brief to this Court suggest that such acceptance of responsibility is disingenuous.


With regard to the loan document forgery, Mr. DiTrapano pled guilty to federal

---

[1]The most troubling actions, allegedly involving the same client, were Mr. DiTrapano's forgery of the client's name on loan documents and his apparent misappropriation of the client's funds which prompted a $1.4 million payment by Mr. DiTrapano's former law firm to the client.

1

felony charges based upon his misrepresentations to the United Bank in Charleston in an attempt to secure a loan and his forgery of the client's signature on those documents. He transferred approximately $40,000 for his own personal use. During the ODC hearing, Mr. DiTrapano addressed the issue of forging loan documents and said: "it has always stood in my mind that there was a certain amount of money that I had coming to me. . . . There probably was some reason, you know, that I put the $35,000 in that account that didn't have to do with, you know, I was just trying to take it for myself. I don't know what that is during that period of time."

The facts surrounding the misappropriation of client funds from a Smith Barney brokerage account and the law firm's subsequent payment of $1.4 million to the client are not extensively developed in the record.[2] In the Lawyer Disciplinary Board Reinstatement Questionnaire, Mr. DiTrapano indicated that his former firm paid his client "a substantial amount of money that [he] was responsible for misappropriating." He also admitted in the Questionnaire that he "[d]id not act professionally in [the] handling of [the client's] Brokerage accounts."

---

[2]Footnote eighteen of the majority opinion alludes to this issue. The Lawyer Disciplinary Board seems to have been far more interested in the drug addiction issues than the honesty and integrity issues. Many of the factual details of such allegations were not sorted out thoroughly. Integrity is at the core of the necessary elements for a lawyer seeking admission or readmission to the Bar of this State.

In the ODC hearing, however, Mr. DiTrapano explained that the money "may have been misappropriated or may not have been." He further indicated that he did not have "any real recollection as to exactly what some of those moneys went for in terms of, you know, what was misappropriated and what was not." He stated:

> I was ousted from the law firm and the law firm never allowed me any kind of accounting on anything. I know that they wanted to maintain the relationship with the client, so they agreed to reimburse anything that was, you know, no - - unaccountable for, and they did that. It was taken out of whatever, you know, part of the firm I still had left or cases there, and then it was charged to me as income. And that's the extent to which I know about any of that.[3]

Mr. DiTrapano emphasized that the United States Attorney's Office "had all of that . . . and they did not charge me with anything and they would've charged me with some kind of crime or some kind of addition to my sentence if they felt like that anything was wrong with that." The accountant for the former law firm apparently provided the financial calculations in determining the amount to be reimbursed to the client. It is disconcerting that after accepting responsibility for misconduct, Mr. DiTrapano then suggests that if there was wrongdoing, the federal authorities would have charged him and that he may or may not have misappropriated such funds. Further, he certainly could have sought further information on

---

[3]Mr. DiTrapano also explained that he was never asked "where did this go or what happened to this?" He stated that he had not been given an opportunity to address the issue of the $1.4 million payment to the client. "I was never asked about or told, you know, what they were doing, other than they were reimbursing this client this amount of money." He said, "And it happened eight years ago and I never had any chance to address any of it."

the nature of the reimbursements to the client from funds held by the law firm.

During the hearing referenced above, Mr. DiTrapano failed to behave in a manner that evidenced complete personal accountability for his actions. While he alleged that he has taken responsibility and is remorseful, his answers to the questions indicate that he is still forwarding excuses for his behavior. For instance, while he stated in the Questionnaire that he does "not even remember" signing the loan papers at United National Bank,[4] he subsequently informed the HPS that he thought he "had authority" to sign his client's name due to "numerous conversations" with the client. He also attempted to minimize the perceived damage by saying that it "was a legitimate business deal where everyone got paid on it. . . ." Further, he presented the self-serving explanation that he sought the United Bank loan to protect his client's interests by obtaining a loan rather than using money in his client's investment accounts, presumably some of the same investment accounts from which Mr. DiTrapano diverted money for personal use, prompting a $1.4 million reimbursement from his former law firm to the client.

From the limited development of these issues in the record, it appears that Mr.

---

[4]Mr. DiTrapano appears to contend that he was so addicted to drugs that he recalls neither signing the fraudulent bank document nor misappropriating some $1.4 million of his client's assets. He also appears to claim that, as a result of his drug addiction, he was incapable of forming intent to act in a dishonest or fraudulent manner.

4

DiTrapano's behavior constitutes an extremely significant direct offense to his client. This Court has not historically looked favorably on that type of conduct. The relationship between a lawyer and his client must remain sacrosanct, and the privilege to practice law must be dependent upon the attorney's ability to act within the confines of ethical mandates. Misuse of a client's money has always been considered one of the most egregious acts committed by an attorney. In *In re Conway*, 526 A.2d 658 (N.J. 1987), the court aptly articulated this concept, as follows:

> This ethical transgression bespeaks irremediable dishonesty and untrustworthiness and, by itself, is determinative of the attorney's unfitness to practice law. The combination of these professional and personal deficits-dishonesty and untrustworthiness-in a lawyer is intolerable. These traits are insufferable because they demonstrate conclusively that the attorney lacks basic rectitude and strength of character. An attorney without the moral fiber to behave with integrity toward his or her own clients cannot be trusted as a lawyer. No confidence can be reposed in such an attorney ever to serve clients with unswerving and singular loyalty. For these reasons, even the attorney's subjective good faith belief that no actual, substantial or lasting harm is being done the client is unavailing[.]

*Id.* at 664 (internal citations omitted); *see also In re R.M.W.*, 486 F.Supp.2d 518, 533 (D. Md. 2007) (chronicling cases in which attorneys have been denied reinstatement due to intentional misappropriation of client funds).

It bears reiterating that this Court has not been unsympathetic to the plight of

an attorney's addiction to drugs, even illegal drugs,[5] while working to remedy the underlying problem through the Lawyers Assistance Program to assist members of the legal profession who have struggled with addiction and seek rehabilitation. As noted by the majority, however, the issue was addressed in *Lawyer Disciplinary Board v. Brown,* 223 W.Va. 554, 678 S.E.2d 60 (2009), and this Court explained:

> Although this Court does not absolutely preclude addiction to illegal drugs as a consideration and while Mr. Brown's actions may have stemmed in part from his cocaine addiction, we simply cannot condone his behavior and cannot accept the Board's recommendation. There is never a valid excuse for stealing client trust funds. "'Misappropriation of funds by an attorney involves moral turpitude; it is an act infected with deceit and dishonesty.'" *Coleman*, 219 W.Va. at 797, 639 S.E.2d at 889 (quoting *Lawyer Disciplinary Bd. v. Kupec*, 202 W.Va. 556, 571, 505 S.E.2d 619, 634 (1998) (additional quotations and citation omitted)). An attorney who misappropriates client trust funds not only harms his clients but also undermines the confidence of the public in the legal profession.

223 W.Va. at 561, 678 S.E.2d at 67. This Court has repeatedly held that "[a]ttorney disciplinary proceedings are not designed solely to punish the attorney, but rather to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice." *Lawyer Disciplinary Bd. v. Taylor*, 192 W.Va. 139, 144, 451 S.E.2d 440, 445 (1994).

---

[5]This Court was careful in *Lawyer Disciplinary Board v. Brown,* 223 W.Va. 554, 678 S.E.2d 60 (2009)*,* to distinguish between legal and illegal drugs. *Id.* at 560-61, 678 S.E.2d at 66-67.

The nature of Mr. DiTrapano's dishonest actions did not involve simple negligence or inattention due to his substance abuse and addictions. Rather, his behavior involved intentionally deceptive acts apparently designed for personal gain, directly harming his client and evidencing a conspicuous disregard for the basic tenets of ethical behavior applicable to the attorney/client relationship.[6] At no point during the course of these hearings did Mr. DiTrapano ever state without equivocation that he had committed multiple violations and that he had taken complete responsibility for his actions. He repeatedly presented claims involving rationalizations, extenuating circumstances, absence of thorough memory, or evasiveness; but, he never unswervingly admitted his mistakes and his own complete and exclusive personal accountability for those mistakes.

Refusal to reinstate Mr. DiTrapano's license at this time is the appropriate action. I therefore respectfully concur with the majority decision in this case.

---

[6]This Court would have benefitted from a more extensive investigation of the issues related to Mr. DiTrapano's client fund misappropriation.